Good morning, your honors. May it please this court. My name is Tony Santorelli. I represent the petitioner. I will reserve one minute. The issues before this court are credibility and nexus to a protected asylum ground. I will deal with the credibility issue first under the clearly erroneous standard. By way of setting up the issues, I'd like to present the fact that the petitioner was the head of a labor union at a government-owned factory. He had worked there since 1987, and in 2003, he started to see corruption. Your honors, he went to his boss, who was the president of the labor union, and he requested help for his workers. The boss threatened him in saying, don't do that. Protect the interests of the company, of the government. Hundreds of his workers were being laid off. At some point a month or so later, 70 of them decided to go to the government and petition for their rights. They had all been laid off while the heads of the company were getting lavish bonuses, were driving big cars. That was perceived as corruption by the petitioner. He elected to go with them to petition the government. The local government saw him as head of this petition, head of these 70 workers that were there. Because of this, he was the only one arrested. He was detained for 15 days. He was interrogated. He was beaten. He was fined. He was never taken before a judge. He was never given the opportunity to see a lawyer. He was simply discarded. He was fired after paying the fine. He stayed in China for a year, living with his wife and his child. He couldn't find a job. This was 10 years ago. He couldn't find a job, and in 2004, June 23rd, he escaped to the U.S. He was here for less than two days when he found out from his wife that his mother had died. And he returned to China on June 30th, 2004. Now the BIA found credibility issues that the judge also found. And the first one was when the petitioner was asked, Sir, from the U.S., how many times did you talk to your wife that first week? His answer at AR-66 is, I spoke to my wife once. Later, when asked, well, how did you find out your mother had died? His answer was, my wife called me. She had a number of somebody I was staying with. She called me and told me. The government then asked, seeing an inconsistency, you mean you don't consider talking to your wife when she calls you? And the petitioner's answer was, and I quote, I didn't. Maybe didn't understand the question. I thought, how many times I called her is what you meant. And that's at AR-67. But on cross-examination at AR-141, the excerpt that I have, the question was, did you speak to her at any time after that phone conversation? Answer, no. Did you speak to anybody else in China during that week? You were in the United States. No. So how did you learn about your mom's death? So the question posed was, did you speak to her at any time? And, Judge Fischer, I believe that sometimes when we're dealing with translators at this court level, sometimes words can be used and the interpretation came out that he believed, the petitioner believed that speaking to, when I speak to somebody, I initiate the call. I made the call. And that was an error in his judgment. But it was not an inconsistency. It was simply a misunderstanding. As to the second issue, and this is Justice ---- I guess this is a post-Real ID Act case. Yes. Pre-Real ID, I guess I would say, even if it was inconsistent, it's so trivial that it wouldn't ---- I mean, obviously he got the news his mother died. He got it from somewhere. Whether he called her or she called him or he got it from a third-party person that she called doesn't really go to the claim. I'm just wondering, though, what is the import of the fact that he returned to China to his overall petition? Your Honor, I think that what occurred here, and this is later looked at as the fourth issue that the BIA rose, voluntary returning to China for 7, 10 days without incident served as an appropriate basis for an adverse credibility finding. This is what the judge had cited. This is what the court at the BIA cited. And they looked at guidance from LOHO. LOHO is an Indonesian lady that had come to the U.S., had spent 10 days here, and then returned to China. She was fine in Indonesia for a while, came back to the U.S., spent 12 days, returned to Indonesia. The BIA's, with respect, the BIA's argument is flawed because in LOHO the answer was, I went back to Indonesia because my boss only gave me 10 days off. I had to go back to work. Here, petitioner's mother had just died. And no matter how he found out, whether he got an e-mail or his wife called him, it's an emergency. And he returned because of that. And, Justice, if I've answered your question, please let, I'll go on. No, that's helpful. I'm wondering, which opinion are we reviewing here, the BIA's or the IJ's? The Board of Immigration is the decision that you are reviewing. Did they adopt the IJ's, find adverse credibility, and adopt those as part of their reasoning? Yes. And they specifically cite the four. And that's what I had hoped to get through in my nine minutes. We're focusing on the four. So one of the four was related to what you were saying, which is they said not only did he get back, but he had testified that he was a high priority for the police. He had to make, what, weekly meetings with them, and they were highly interested in it. So how did he, as the immigration judge said, how could he come and go if he's such a high-intensity figure in the police radar, so to speak? And that's a very good question. My answer to you, Judge Fischer, is this. In China there are local police, as we have in the U.S. There are county police. There's federal police. He was able to enter the country based on the supervision of the federal police at the airports where they were not looking for him. The local police in his town was the one that was going to his house and harassing his wife, trying to find out where he was. There wasn't a connection at that time between the local police that was searching for him and the federal police, more like our border patrol. Our border, don't analogize there because they do coordinate. Yes. I meant to say that there is. Was the I.J. compelled to accept that explanation? I don't believe so, Your Honor, and he looked at it as a credibility issue. He felt, again, that he could not have returned, the I.J. did, and be there for 17 days without issue. A second issue related to that one, Judge Fischer, is this, and this is most egregious. When asked, when you returned to China, did you stay with your wife? And that's at A.R. 70. In court, petitioner answered, no, I stayed at a friend's house, and yet he was challenged later because in a written declaration he wrote in English, or it's written in English, I had to stay at a relative's house. Now, in my brief to you, my arguments to that were that maybe relatives sometimes are considered friends or there are more people living in the house, there was a friend and a relative. Also, as a term of endearment, sometimes in China you'll say my neighbor, my grandmother, because it's a term of friendship or a familial term. However, it's a simpler argument today than that. And, Justices, I found out this last night. I discovered that there's an error in the translation of the handwritten declaration. Petitioner wrote a seven-page declaration in his handwriting, and on the second to last page, six lines from the bottom, he states in Chinese, had to hide at my friend's place, and that's at A.R. 272, six lines from the bottom. I had to hide in my friend's place. However, the translation into English at A.R. 265, the translation states in English, hid at a relative's place. Justices, it was too late to prepare any sort of brief on that issue. I would ask simply that you consider it. If there's anybody in this building that speaks Chinese, point out to six lines from the bottom, second to the last page. There is no inconsistency, just a translation error. Your Honor, because of the time, I would like to go on to the issue of nexus to a protected ground, and I would use the clearly, excuse me, the noble standard of review. Okay. Counsel, you're over your time. Do you want to have rebuttal time? I think we understand the nexus argument. Okay. You said because it was the government-owned company, and he was demonstrating it as an imputed political opinion? Yes, and he was there carrying a placard that said, protect the workers, down with corruption. So, yes, that is the nexus I would reserve. Thank you. Thank you. Counsel, do you speak Chinese? You do. Okay. But you should know that the Chinese. Do you read it too? You don't read it. Okay. Chinese is not phonetic, and so you have to actually memorize each word. Each sign? Yeah, each character. That's why it's so hard to learn. That's why it's hard. Yes. May it please the Court, Dan Shih on behalf of the United States Government. If it pleases the Court, this case turns on two alternative fact-bound issues. First, whether the agency reasonably found the petitioner was not credible, and second, assuming he was credible, whether it reasonably found his political opinion was not one central reason for his persecution. Because the answer to both of these questions is yes, this petitioner. What if the answer to the second question was no? Would that affect the government's assessment of credibility? It would not, Your Honor, because, as I noted, these are two alternative issues. I'm saying you lose on one. Right. Even if we lose on the second issue, the first issue is still whole because his claim itself is called into question by his credibility. And you think the credibility points that were made, like the phone call, cross-examination, or that testimony, is sufficient to uphold an adverse credibility? We believe so, Your Honor. If one were to assume that he did qualify for the protected ground? Assuming he did qualify on the protected ground, we still believe that the adverse credibility should be sustained. And what about the mistranslation? If you verify that what counsel has just represented, it's true? There are still other credibility findings. And what's the strongest? I think there are three that are the most compelling. Going back to your question earlier, Judge Fischer, you had asked what is before the court for review. I asked that. I'm sorry, Judge Wardlaw. We get confused a lot. Counsel, what do you consider the strongest point? We consider there's three that are equally strong. But perhaps the strongest one is that he claimed he was knocked unconscious and that he didn't wake up. Your voice is fading away. Can you speak into the microphone? Pull the microphone closer to you. Oh, I'm sorry. Speak right into the microphone if I'm going to hear it. What is your strongest point? Is this? What? The point that he claimed he was knocked unconscious when he was arrested, perhaps is the strongest inconsistency. But the one about who he stayed with and the number of times he spoke to his wife are also significant. But let me ask you, what is the strongest one? Please, I don't quite get what your point is. What is the strongest inconsistency? We think all three of those are equally strong. If I had to pick one, perhaps being knocked unconscious would be the strongest claim. He was knocked unconscious. When did he say that? When did he say he was knocked unconscious? He testified that he was knocked unconscious for 20 to 30 minutes. That's on page 122 of the administrative record, Your Honor. And why is that not believable? Well, it goes to two things. First, he never mentioned it in his statement. And his statement isn't just a cursory two-line addition to an asylum application. His statement is three pages, single-spaced. It's a very detailed statement of his claim. And he makes no mention of being knocked unconscious. He says, however, in his statement that he was hit on the head very hard and then he was placed in the police car and then he was brought to the police station. But he testified that he was knocked unconscious for 20 to 30 minutes, and the next thing he knew, he woke up. He was in the police station. How did he know he got into a police car if he was knocked unconscious for 20 to 30 minutes? Somebody told him. Somebody may have told him, but it seems something that you would include. Somehow he was in one place and ended up in the police station. He could have just assumed it. I mean, how did he get from where he was protesting to the police station? He could have been brought there in an ambulance, though. Someone could have carried him. Police station? He said he was hit pretty hard. So it also goes to how badly he was injured. So to say you were knocked unconscious for 20 to 30 minutes versus being hit. That isn't why they found him not credible on that basis. The reason they found him not credible on that basis was that the IJ and BIA found that this wasn't clearly erroneous. The immigration judge concluded that you can't be knocked unconscious for 20 minutes without having longer-term or greater consequences. Do you know if that's true or not? I don't, Your Honor. I don't either. I don't. I mean, so was the judge just speculating? I think the judge was able to look at facts and look at implausibilities. He certainly was speculating when he was talking about when he was equating the Chinese company to an American capitalist company where, you know, the CEO gets lavish benefits and it's not considered corruption. We've got to call the person back here. And he was certainly speculating when he was talking about all of the protections, equating the protections that must exist in China in terms of letting people leave the country or not leave the country with what we have in place in the United States since 9-1-1. Your Honor, I respectfully disagree on some of those points. But you do agree to some extent that he was speculating. When you find something implausible, you have to speculate. But the problem with some of these IJs is that they base their conclusion about how things work in another country on how things work in the United States without really looking at the country reports. But they often do, Your Honor. And not only that, they see hundreds of these cases a year. I know. I know. And that's another interest. So do we. Yeah. Yeah, unfortunately. Not as many as they do. Not as many as they see because they grant some. But that's an interesting thing about this case because we're generally – I mean, I'm seeing right now a lot of cases claiming persecution on account of being Christian, either in China or Indonesia, being a Chinese Christian and having gone to house churches. And I understand the IJs are having problems figuring out if something's scripted or not scripted in that case. But this is kind of a novel kind of claim. Yes, Your Honor. I don't mean to interrupt. No, go ahead. What I was going to say is that's why I started at the beginning by saying this is a very fact-bound case. The burden of proof is not on the IJ to find him eligible for asylum. The burden of proof is on the petitioner to show why all these things actually happen to him. He needs to show that. And here, so even with the factory, whether it's a private or a government company, it's not clear. I've read this asylum application statement three, four, five times. And we know the union is tied to the government. The union is part of the factory. Did you read it three times or five times? Parts of it. I've read the whole thing through. Okay, see, do I find you not credible because you couldn't remember whether it was three or five? Were you representing, trying to enhance it? This is the problem. I'm not trying to be picky. No, I understand, Your Honor. I'm just saying, you know, we get the transcripts, we look at the Q&A, and we defer to the IJ's demeanor findings if they make them here. But here's my, before we lose the argument that we were making, both I and Judge Noonan asked you to pick the strongest example of credibility. You picked the one that the BIA didn't mention. They focused on the issue of the relative and the phone calls. Those are the two that they thought, in their view, justified the adverse credibility. So what inference do we draw from your selecting one that the BIA didn't seem to think was all that important and not enough to mention? Your Honor, I would respectfully not ask you to read too much into it, only because my position is all three of these findings, who he stayed with. But I know your position is that, but you said in your judgment the strongest, and you gave reasons for it, that nowhere appear in the BIA's findings. And that's what we're reviewing. Right. That's your interpolation on it. Now, I will, just for the record, I want to note, you haven't done so, but the IJ on the difficulties did, in fact, cite some documents to support the conclusion that he would have had trouble. Isn't that correct? Yes, Your Honor. Okay. And I would add also that the, in terms of the adverse credibility finding, the Board, in this case, affirmed the whole thing. And it was just simply citing examples. Now, it may have been citing examples it felt were the strongest. I assume that. Right. But it could have been the ones that most readily came to mind. Then I had asked you, what do you think of the credibility case if, in fact, he was right, that there was a mistranslation, which is one of the two grounds they cited. I still think the other, I still think the one. What do you think the BIA would think? I think the number of times he called his wife is still very significant. And let me explain why. It wasn't just a, I don't remember how many times I called my wife every day. So it's certainly a reasonable thing to get wrong. But this wasn't an ordinary phone call. This wasn't, I'm going to be home late from work. This isn't. That wasn't his explanation. He didn't say he forgot. He said he misunderstood the question. And counsel said he thought he was responding to when he called. Right. What I'm saying is based on, as Judge Fischer, as you noted, based on a reading of the transcript, he's, the respondent, the petitioner is claiming that there was a mistranslation by the translator as he's claiming there's a mistranslation in the statement. But there's no evidence. This is a. Well, let's, okay, we'll quibble over the Q&A. What reason would he have to lie about how many times he talked to his wife? He did go back, did he not? Here's why it was important that he. So. He wanted to. Is there any doubt that he went back because his mother died? Is that what they're saying? They don't believe that he actually went back there because of the death of his mother? No, they don't. I think what they don't believe is how much, if the police were even looking for him, let alone how significantly. They don't believe his claim of persecution. There's no evidence to corroborate. What is the significance of the interchange about the phone calls? How much risk. Why does that go to the heart of his claim? Because it doesn't have to go to the heart of the claim, but it is material. And it's material because it goes to how much willingness he is to take a chance to reach out to his wife when he's being searched for by the police. So. Is that what the BIA said? The BIA simply identified that as an inconsistency. I'm trying to understand. Okay. But what I'm saying, the point is, it wasn't an ordinary phone call. He was on the run. He was from the police. He didn't say he didn't talk to her. What he said, he misunderstood the question. Right. But it was only after the fact of how did you find out about your mother dying if she didn't tell you the first time, then this explanation came about. But before that, he never added that, that, you know, I talked to my wife. All right. Counsel, you've had almost three minutes over. Thank you very much. It was a good argument. All right. I'll give you an extra minute, even though you're also over. I should give you as much as I can. One minute. Thank you. That's all I need. Justice and Justice Fischer. We're judges. We're judges, not justices. We're not justices. That's in the Court of Appeal. California Court of Appeal. Our friends on the U.S. Supreme Court would not appreciate us being called justices. Judge Fischer, I don't practice in this court often enough to know the difference. Thank you for educating me. I think the issue that counsel raised as to whether or not he called his wife once when he first arrived and then subsequently his wife called him to tell him his mother had died, the key point that counsel missed is the mother had not died during that first conversation on June 23rd. His conversation with his wife was, I'm here, I'm safe. And it was a brief conversation. The record reflects that. Several days later, perhaps three days later, the mother dies, the wife calls him. Now, when he's asked on direct, how many times did you talk to your wife? He thought, I initiated. I talked to her once. And then, again, and I'm repeating myself, and I don't like to do that, but it's important. When the wife reached out to him, he didn't think he had initiated that call. So it wasn't like I called her, and he explains that clearly. In the abundance of caution, I would ask that you reverse the decision of the IJ. Here's a person that has been away from his wife and his child for 10 years, from June of 2004 until now. I submit to your justices. Thank you. Thank you, counsel. Juve versus Holder will be submitted.
judges: Noonan, Wardlaw, Fisher